[Cite as *Interstate Petroleum Co. v. Young*, 2013-Ohio-1943.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| INTERSTATE PETROLEUM COMPANY, | : | **O P I N I O N** |
| Plaintiff-Appellant, | : | |
| - vs - | : | **CASE NO. 2011-T-0090** |
| MAURICE YOUNG, et al., | : | |
| Defendants-Appellees. | : | |

Civil Appeal from the Trumbull County Court of Common Pleas, Case No. 09 CV 682.

Judgment: Affirmed in part; reversed in part and remanded.

*Kyle B. Smith*, 36 W. Jefferson Street, Jefferson, OH 44047; *John K. Keller*, Voys, Sater, Seymour & Pease, LLP, 52 East Gay Street, Columbus, OH 43216; and *James A. Sennett*, Cowden & Humphrey Co., L.P.A., 4600 Euclid Avenue, Suite 400, Cleveland, OH 44103 (For Plaintiff-Appellant).

*Bruce E. Smith*, Geiger, Teeple, Smith & Hahn, P.L.L., 1844 West State Street, Suite A, Alliance, OH 44601-2415 (For Defendant-Appellees).

THOMAS R. WRIGHT, J.

{¶1} This appeal is from a final order of the Trumbull County Court of Common Pleas. Judgment was entered in favor of appellees, Maurice Young, Mary Lou Young, and Brian Armour, in accordance with a jury verdict. As to the primary claims of the respective parties, the jury essentially found that an oil and gas lease agreement was no longer enforceable against all three appellees. Appellant, Interstate Petroleum Company, challenges various rulings.

{¶2}   As of April 1978, Edward and Jean Shones were the owners of 123 acres of real property in Bristol Township, Trumbull County, Ohio.  This property was divided into two tracts, one containing 63 acres and the other containing sixty acres.  The larger tract was being used as a public campground, while the smaller tract consisted primarily of woods.

{¶3}   To increase their income from the entire property, the Shones executed two oil and gas lease agreements with R.P. Gas & Oil Ventures.  As to the sixty-acre tract, the agreement gave R.P. Gas the contractual right to extract any oil and gas located beneath the land.  For consideration, the Shones were entitled to receive a yearly royalty of one-eighth of the gross proceeds from the oil and gas production.  In addition, the agreement provided that if no well had been started on the tract by a particular date, the lease would automatically terminate unless R.P. Gas paid a sum of $60 as a rental.  Finally, the term of the lease was for one year, but the agreement also stated that it would "extend as long thereafter as oil and gas, or either of them, is produced by lessee from said land * * *."

{¶4}   The Shones also executed a similar lease agreement in regard to the "campground" tract.  However, the subject matter of the underlying case relates solely to the lease agreement for the wooded sixty-acre tract.

{¶5}   Approximately one year later, R.P. Gas assigned its rights under the lease agreements to Interstate Petroleum Company, a sole proprietorship owned by Kenneth Adams.  Over the next five years, Adams drilled four separate wells at various locations in the 123 acres.  Although two of the first three wells produced a small amount of gas and oil, each of these particular wells were capped within a short period.  However, the

fourth well, drilled in 1984, continued to be productive for approximately fifteen years.

{¶6} The fourth well was situated on the wooded sixty-acre tract. On the eastern boundary of that tract was a railroad right-of-way which had previously been abandoned and stripped of its rails. Once the fourth well had become productive, Adams built a gravel roadway running from the railroad right-of-way into the woods. This new roadway was the sole path by which Adams accessed the site of the fourth well. In addition to having the trees cleared for the roadway, Adams employed a specific type of gravel to ensure that the road could withstand the large trucks used in transporting the oil. He also installed a gate at the entrance of the roadway so that no one else would access the well from the railroad right-of-way.

{¶7} At the site of the fourth well, Adams installed a number of items to facilitate the production of the oil and gas. Connected to the main pipe from the well was a device called a separator, used to separate the oil from the gas. The separator was housed in a structure Adams built. The gas was then propelled into a distinct underground pipe that went across the property and eventually connected to a local natural gas supplier. The oil was transferred to two outdoor tanks where it was held until it was placed in oil trucks for shipment to a local refinery.

{¶8} In 1990, the Shones sold both tracts of land, including the campground, to Maurice and Mary Lou Young. Approximately one year later, Mr. Young entered into a written supplemental gas agreement with Interstate Petroleum Company, allowing him to take up to 200,000 cubic feet of gas from company wells each year at no costs. The gas was to be used to heat buildings associated with the campground. The supplemental gas agreement further provided that if the Youngs used more than

3

200,000 cubic feet in a given year, they would be charged the "wellhead price" and any reasonable costs the company incurred in producing the gas. The agreement also stated that if the Youngs failed to pay for any excess gas, the debt could be deducted from the Youngs' future royalty payments.

{¶9} At the end of the 1994 fiscal year, Adams informed the Youngs that they had used approximately 810,000 cubic feet of gas during the preceding twelve months. According to Adams, when he told Mr. Young that he was liable for nearly $3,800 under the supplemental agreement, Young told him to deduct it from the royalties under the lease. Therefore, Adams did not send the Youngs any royalties over the ensuing years.

{¶10} As part of his company's production of oil from the fourth well, Adams always had the oil transported to an oil refinery in a neighboring state. However, in 1999, that refinery ceased operations. Thus, when Adams was unable to locate a new refinery for his business, he shut down the fourth well, and no new oil or gas was produced from the well thereafter.

{¶11} One year later, the state of Ohio obtained title to the abandoned railroad right-of-way through eminent domain, and constructed a bike trail along the path of the right-of-way. Since the trucks used for transporting the oil were not allowed on the bike trail, Adams no longer had access to the roadway he built from the right-of-way to the fourth well.

{¶12} Over the next eight years, the status quo remained the same. According to Adams, he twice asked Mr. Young whether he could construct a new roadway to the fourth well from an existing street, but Young always told him to contact the state about using the bike trail. According to the Youngs, they did not see Adams on the sixty-acre

tract over the entire eight-year period.

{¶13} Starting in November 2008, Adams went onto the sixty-acre tract on foot for the stated purpose of inspecting the equipment to ensure that it was still in a safe condition and operable. Each time Adams walked in the area of the well, he was confronted by the Youngs' grandson, Brian Armour, who ordered Adams off the property on the basis that he was trespassing.

{¶14} During this same time frame, the Youngs built a new roadway across part of the sixty-acre tract. When Adams went on the property in late 2008, he noticed that some of the equipment he had placed on his roadway or near the fourth well had been taken. For example, he noted that his gate had been removed from the entrance to his roadway and moved to the Youngs' new roadway.

{¶15} Accordingly, Adams' company, appellant, instituted the underlying civil action in March 2009. In its original complaint, the company only named the Youngs as defendants. However, almost immediately after the filling of the action, the Youngs transferred their interest in the vast majority of the 123 acres. First, they transferred 58 acres of the sixty-acre tract to their grandson. Second, they sold the entire 63 acres of the second tract, i.e., the campgrounds, to Joseph and Zephia Hagen. In light of these transactions, the company amended its complaint twice, adding Armour and the Hagens as defendants. The Hagens were subsequently dismissed before the case went to trial.

{¶16} The company's complaint was primarily based upon two basic assertions. First, the company alleged that the Youngs and Armour violated the original lease agreement by denying the company access to the sixty-acre tract. Second, the complaint asserted that the Youngs and Armour converted some of the company's

5

property associated with the fourth well. As part of its request for monetary damages, the company also sought to recover the funds the Youngs allegedly owed for the excess gas used in 1994.

{¶17} In conjunction with their collective answer, the Youngs and Armour raised three counterclaims against Adams' company. Under the first two counterclaims, they alleged that the "oil and gas" lease agreement was no longer enforceable because the company violated certain contractual terms and implied covenants by not properly developing the resources of the land. Under the third counterclaim, they asserted that the company abandoned the various items associated with the fourth well.

{¶18} A jury trial was held in June 2011. At the close of the evidence, the trial court granted the Youngs'/Armour's motion for a directed verdict concerning the company's claim to recover the funds owed for the excess gas used in 1994. The court concluded that the "gas" claim was based upon an account or oral contract, and therefore barred under a six-year statute of limitations. In all other respects relevant to the issues on appeal, the trial court allowed the respective claims and counterclaims to go to the jury.

{¶19} In returning its general verdict in favor of the Youngs and Armour, the jury answered interrogatories. Under the second interrogatory, the jury found that Adams' company violated either an express term of the original lease agreement or an implied covenant; therefore, the lease agreement was terminated. Under the fourth interrogatory, the jury found that Adams' company abandoned the physical items associated with the fourth well. Upon accepting this verdict, the trial court entered judgment accordingly.

6

{¶20} In appealing, Interstate Petroleum Company ("the company") assigns the following as error:

{¶21} "[1.] The trial court erred in granting defendants' motions for directed verdict to dismiss [the company's] claim that defendant Young owed [the company] $3,800.00 for using excess gas, and preventing [the company] from arguing that issue before the jury, on the basis that a six year statute of limitations had expired.

{¶22} "[2.] The trial court committed prejudicial error by giving the jury instructions that the lease could be forfeited if implied covenants were violated 'and mere damage award to [the company] would be inadequate.'

{¶23} "[3.] The trial court erred in refusing to grant [the company's] motion for directed verdict, or its earlier motion for summary judgment, on the basis that Young's claims for forfeiture and abandonment were moot for the reason that Young had sold all but two acres of the original leasehold to other and [the company] had released his mineral rights.

{¶24} "[4.] The trial court erred in refusing to grant [the company's] motion for directed verdict and earlier motion for summary judgment because Armour had no standing to claim forfeiture and abandonment when he filed such claims within four weeks of obtaining an interest in the land and leasehold.

{¶25} "[5.] The jury verdict and judgment finding that [the company] had abandoned the well, the well battery and equipment was not supported by sufficient and credible evidence and was against the manifest weight of the evidence.

{¶26} "[6.] The court erred in refusing to allow into evidence Exhibits 9R, 9S, 9T and 9U on the basis of relevance when in fact such exhibits were relevant to show an

7

intent not to abandon the well and its equipment."

{¶27} The company's first assignment pertains to its claim that it was entitled to recover $3,800 from the Youngs for the use of excess gas in 1994. As previously noted, the trial court concluded this claim was barred under the six-year statute of limitations expressed in R.C. 2305.07 because it was based upon an oral contract or an account. The company submits that the dismissal of the "excess gas" claim should be reversed because the trial court mischaracterized the nature of the underlying debt. Specifically, the company contends that the fifteen-year statute of limitations under R.C. 2305.06 is applicable because the debt for the excess gas is predicated upon the terms of a written contract.

{¶28} The company's argument on this point is based upon the supplemental gas agreement, which was executed by the company and Mr. Young in 1991. In regard to the use of more than 200,000 cubic feet of gas in a given year, the supplemental gas agreement first provides that Mr. Young is obligated to pay for the excess gas at the "wellhead price" plus reasonable production costs. The agreement further provides that any debt for the excess gas could be paid by deducting the costs from any yearly royalties due to the Youngs under the oil and gas lease agreement.

{¶29} When considered as a whole, the supplemental gas agreement gave the Youngs two separate means in which to satisfy any debt for the excess gas. Therefore, when a debt arose for the use of excess gas, it still had to be determined how the debt would be paid in a given instance. As to the specific debt for 1994, Adams testified that he and Mr. Young had an oral discussion about the matter when he informed Young of the debt. Adams further testified that Young orally agreed to have the debt deducted

8

from his royalties in lieu of a direct payment.

{¶30} In regard to the time limits for maintaining a civil case based upon a contractual relationship, R.C. Chapter 2305 sets forth two controlling provisions. First, R.C. 2305.06 provides if a contract, agreement, or promise is in writing, any ensuing action must be filed within fifteen years of the accrual of the underlying claim. On the other hand, if the action is predicated upon a contract not in writing, R.C. 2305.07 states that the statute of limitations for such an action is only six years.

{¶31} As one basis for its decision to apply the six-year statute, the trial court held that the debt for the use of the excess gas had been based upon an account which the Youngs had with Adams' company. A review of the pertinent case law readily shows that, in contract actions involving "open" or "running" accounts, Ohio courts have generally concluded that the six-year limit of R.C. 2305.07 is applicable. *See Rudolph Bros. v. Husat*, 90 Ohio L. Abs. 1, 1961 Ohio App. LEXIS 748 (7th Dist.); *Barnets, Inc. v. Johnson*, 12th Dist. No. CA2004-02-005, 2005-Ohio-682. However, our review of these cases also shows that the decision to apply R.C. 2305.07 did not turn simply upon the fact that the underlying contract could be characterized as an "account." Rather, the decision turned upon the point that the account in those cases was viewed as a series of implied or unwritten contracts. *See, e.g., Barnets, Inc.*, at ¶18. In fact, as part of its general analysis of the application of the two "contract" statutes of limitations, the *Rudolph Bros.* court emphasized that the fifteen-year limit applies whenever the terms of the contractual relationship are delineated in writing. *Rudolph Bros.*, 1961 Ohio App. LEXIS 748, at *2.

{¶32} In other words, the six-year limit for an oral contract does not apply when

9

there exists a written instrument which sets forth all essential terms of the parties' agreement. *Culp v. City of Lancaster*, 150 Ohio App.3d 112, 2002-Ohio-6098, ¶31 (10th Dist.); *Mancino v. Rydarowicz*, 7th Dist. No. 98-CO-42, 2000 Ohio App. LEXIS 492, *6. Furthermore, the "written contract" requirement of R.C. 2305.06 is satisfied even if the written instrument does not state the exact sum owed by a party because it is only necessary for the written instrument to delineate the terms. *Claxton v. Mains*, 33 Ohio App.3d 49, 51 (10th Dist.1986). In summarizing the basic test for the application of the fifteen-year limit in contract cases, the *Claxton* court stated:

{¶33} "[I]n order for an action to come within the statute of limitations governing actions under R.C. 2305.06, the written instrument must clearly define the unilateral or bilateral obligations of the parties without reference to supplemental evidence to establish the terms of the agreement, contract, or promise. When such a written instrument exists, the appropriate statute of limitations is fifteen years, as provided in R.C. 2305.06, regardless of whether the agreement, contract, or promise states a sum certain." *Id.*

{¶34} In our case, a review of the trial transcript demonstrates that it was not necessary for Adams to present any "supplemental" evidence, such as his own testimony, in order to establish the terms of his separate "gas" contract with the Youngs. Instead, the terms of that contract were established exclusively through the submission of a copy of the written supplemental gas agreement into evidence. In addition to stating that the Youngs would be liable for any amount of gas used which was greater than 200,000 cubic feet per year, the agreement set forth a specific formula for calculating the cost of any excess gas. Moreover, the written supplemental agreement

10

provided that if the Youngs chose not to make a direct payment for the excess gas, the amount owed could be deducted from the one-eighth yearly royalties due under the oil and gas lease agreement.

**{¶35}** As part of his trial testimony, Adams made statements regarding the amount of excess gas the Youngs used in 1994 and the resulting sum, based on the contract formula, which they owed to his company. However, in providing this "supplemental" evidence, Adams was not attempting to delineate a new term for the supplemental gas agreement. Rather, he was only employing the existing written terms to determine the sum owed for that particular year. Pursuant to the *Claxton* precedent, the need for such oral testimony did not alter the fact that the supplemental gas agreement was a written contract for purposes of the fifteen-year statute of limitations under R.C. 2305.06.

**{¶36}** Similarly, by orally indicating to Adams that the debt could be subtracted from the yearly royalties, Mr. Young was not changing, or adding to, the specific terms contained in the written supplemental agreement. Instead, Mr. Young was only choosing which of the two available ways he would pay Adams' company for the excess gas. To this extent, Mr. Young's oral statement did not have the effect of transforming the written supplemental agreement into an oral contract.

**{¶37}** Given that all of the terms of the gas agreement between the Youngs and Adams were set forth in a written instrument, the fifteen-year statute under R.C. 2305.06 is controlling. Because the underlying action was commenced approximately fourteen years and nine months after the accrual of the "excess gas" claim in June 1994, Adams' company brought that claim in a timely manner.

11

**{¶38}** As a separate contention under this first assignment, the company submits that, given that its "excess gas" claim was not time barred, it is also entitled to a new trial on the issue of whether it violated the terms of the oil and gas lease agreement. The company emphasizes that, in light of the trial court's decision on the "statute of limitations" question, it was unable to provide the jury with any logical explanation for its failure to pay the one-eighth yearly royalties to the Youngs. The company further submits that if the jury had been permitted to consider its argument that it was no longer liable for the royalties due to the "excess gas" debt, the jury may have found that no breach had occurred and, thus, the oil and gas lease agreement was still enforceable.

**{¶39}** Under their first counterclaim against the company, Armour and the Youngs alleged that Adams violated the express terms of the oil and gas lease agreement in two respects: (1) by not making the yearly royalty payments; and (2) by failing to continue to produce oil or gas from the property after the expiration of the first year of the agreement. However, when the trial court instructed the jury on the first counterclaim, it did not make any reference to the alleged failure to pay the royalties. Instead, the first counterclaim went to the jury solely on the issue of whether the company violated the "continuous production" term of the lease agreement. For this reason, the jury verdict in favor of the Youngs and Armour on their first counterclaim could have only been predicated on the finding that Adams and his company failed to comply with the "continuous production" provision.

**{¶40}** In addition, despite the fact that the trial court did not allow the company to go forward on the "excess gas" claim, Adams was still permitted to testify that the

12

company had the right under the supplemental gas agreement to offset any yearly royalties against any sum owed for excess gas. Therefore, Adams and his company did have the opportunity to explain to the jury why no yearly royalties were paid after 1994.

{¶41} Given that the company's alleged failure to pay the required yearly royalty could not have formed the basis of the verdict for the Youngs and Armour on any of their three counterclaims, the company is only entitled to a new trial on its separate claim for recovery of the $3,800 "excess gas" debt. To this limited extent, the company's first assignment has merit.

{¶42} The company's second assignment of error challenges the propriety of a jury instruction the trial court gave regarding the possible remedy that could be imposed if it found that Adams violated an implied covenant under the oil and gas lease agreement. As to the Youngs'/Armour's second counterclaim, the trial court instructed the jury that the execution of the lease agreement resulted in an implied covenant that the company would act reasonably to develop the property. The trial court further instructed that if the jury found that an award of damages would not be adequate relief for Armour and the Youngs, the lease agreement could be declared invalid. In arguing that this instruction was not appropriate, the company submits that the jury should have been told that only damages could be awarded because Armour and the Youngs had not produced any evidence showing that such an award would be inadequate.

{¶43} In raising the foregoing argument, the company seeks reversal of the jury determination that the oil and gas lease agreement must be declared void or terminated as a result of the company's behavior. Upon reviewing all aspects of the jury verdict, this court holds that there is no need to address the merits of the company's second

13

assignment because there was a separate and independent basis for the jury to find that the lease agreement was no longer enforceable. As will be discussed below, the jury could have based its termination verdict solely upon a finding that the company violated an express term of the oil and gas lease agreement, as compared to a breach of an implied covenant. In light of this, any error in the trial court's jury instruction regarding the proper remedy for a breach of the implied covenant would not be prejudicial pursuant to the two-issue rule.

{¶44} In conjunction with their answer in the underlying action, the Youngs and Armour raised two counterclaims pertaining to the continuing enforceability of the oil and gas lease agreement. Under the first counterclaim, they alleged that the company breached an express term of the lease agreement because it failed to produce oil and gas continuously from the leased property after the expiration of the first year of the lease, as required. Under the second counterclaim, appellees alleged the company breached the implied covenant to continue to develop the property. For their relief under both of these counterclaims, Armour and the Youngs requested a declaration that the company forfeited its rights under the lease agreement.

{¶45} At the conclusion of the trial, the trial court instructed the jury as to the elements of the first two counterclaims and when the lease agreement could be declared terminated under each. In subsequently issuing its verdict, the jury specifically found in an interrogatory that the oil and gas lease agreement terminated because the company violated the agreement without justification. However, in that interrogation, the jury was not required to indicate whether it found breach of an express term, i.e., the "continuous production" provision, or breach of an implied covenant.

14

**{¶46}** As previously mentioned, when the trial court instructed the jury on the "express term" counterclaim, it only referred to that provision of the oil and gas lease agreement stating that the agreement would remain in effect "as long thereafter as oil and gas, or either of them, is produced by lessee from said land * * *." There was substantial evidence demonstrating that Adams' company breached this express provision by failing to produce any oil or gas from the sole remaining well since early 1999. Moreover, in pursuing this appeal, the company does not contest the merits of the jury verdict on the "express term" counterclaim.

**{¶47}** Given these circumstances, the jury's decision as to the termination of the oil and gas lease agreement could have been predicated solely upon a finding that the "continuous production" provision was violated. As a result, any separate finding as to a breach of the implied covenant would be inconsequential, to the extent that it would have no effect upon the general validity of the jury verdict on the first two counterclaims. In other words, any alleged errors in the trial court's instructions on the "implied covenant" counterclaim must be viewed as non-prejudicial under the two-issue rule.

**{¶48}** In explaining the general logic for the two-issue rule, this court has stated:

**{¶49}** "The two-issue rule originated in *Sites v. Haverstick* (1873), 23 Ohio St. 626, and was recently cited with approval in *Pulley v. Malek* (1986), 25 Ohio St.3d 95. The rule has been defined as follows:

**{¶50}** "'"* * * Error in the charge of the court dealing exclusively with one or more complete and independent issues required to be presented to a jury in a civil action will be disregarded, if the charge in respect to another independent issue which will support the verdict of the jury is free from prejudicial error, unless it is disclosed by

interrogatories or otherwise that the verdict is in fact based upon the issue to which the erroneous instruction was related." *Bush v. Harvey Transfer Co.* (1946), 146 Ohio St. 657 (33 O.O. 154), paragraph three of the syllabus.' *Pulley*, *supra*, at 97.  * * *.

{¶51} "Restated, the rule will generally be applied,

{¶52} "'* * * where there are two causes of action or two defenses, thereby raising separate and distinct issues, and a general verdict has been returned, and the mental processes of the jury have not been tested by special interrogatories to indicate which of the issues were resolved in favor of the successful party * * *.' *H.E. Culbertson v. Warden* (1931), 123 Ohio St. 297, 303." *Earl Evans Chevrolet, Inc. v. General Motors Corp.*, 74 Ohio App.3d 266, 273 (11th Dist.1991).

{¶53} Given that a general verdict was rendered on the "termination" issue in this case, even if the evidence was not sufficient to warrant a jury instruction relating to when the oil and gas lease agreement could be terminated based upon a breach of the implied covenant to continue to develop the land, the error was not prejudicial to the company because there existed a separate and independent basis for finding that the lease agreement must be deemed terminated.  For this reason, the company's second assignment is without merit.

{¶54} The company's third and fourth assignments advance similar issues, and will be addressed together.  Essentially, the company submits that neither Armour nor the Youngs had proper standing to maintain the two claims regarding the continuing enforceability of the lease agreement and the claim concerning the conversion of the well equipment.  As to the Youngs, the company contends that they could not proceed on any of the counterclaims because they no longer own any interest in the majority of

16

the sixty acres which constituted the leasehold. As to Armour, the company argues that he should not have been permitted to go forward because he was not the owner of the property when the events forming the basis of the counterclaims took place.

{¶55} In relation to both Armour and the Youngs, the various issues set forth in their counterclaims not only stated the bases for their request for affirmative relief, but also stated their general defense to the company's claims. For example, in relation to the company's conversion claim, the assertion that the company abandoned the well equipment clearly served as the Youngs'/Armour's defense to the improper taking of the equipment and materials. For this reason, both Armour and the Youngs had the right to present evidence pertaining to the issues upon which the counterclaims were based.

{¶56} As to the distinct question of which defendants were entitled to affirmative relief under the counterclaims, the evidence at trial readily established that Armour had become the sole owner of the vast majority of the land and the sole owner of the mineral rights. Although the Youngs retained two acres of the disputed sixty-acre tract, Adams' company executed a release of its rights under the lease to the oil and gas beneath those two acres, and Adams was not attempting to go onto their land. As a result, only Armour, not the Youngs, was presently embroiled in those disputes. Similarly, only Armour was claiming the abandoned equipment and materials, as they remained solely upon his 58 acres.

{¶57} In its final order, the trial court entered judgment solely in favor of Armour on the three counterclaims. Therefore, allowing the Youngs to remain as parties to the action had no adverse effect upon the outcome of the case. For this reason, the company's third and fourth assignments do not have merit.

17

**{¶58}** The company's remaining two assignments are likewise interrelated, in that they both pertain to the merits of the jury verdict on the Youngs'/Armour's third counterclaim. Under that claim, the Youngs and Armour sought possession and ownership of the various equipment associated with the fourth well on the grounds that the company abandoned the items on the leasehold. Under its fifth assignment, the company maintains that the verdict in favor of the Youngs and Armour on the abandonment counterclaim is against the manifest weight of the evidence. Under its sixth assignment, the company asserts that the trial court erred in not allowing it to introduce four photographs of the disputed equipment into evidence.

**{¶59}** The merits of the evidentiary ruling will be addressed first. After the underlying action was filed, the trial court issued a judgment ordering the Youngs and Armour to permit Adams to go onto the leasehold property for the purpose of checking the status of the fourth well. As part of that visit, Adams made certain repairs, including placing a new coat of primer on some of the "well" equipment. Adams then documented the repairs by taking photographs of the equipment.

**{¶60}** At trial, the company sought to introduce the four photographs of the newly-painted equipment for the purpose of rebutting the allegation that Adams abandoned the equipment over the ten-year period since the production of oil and gas stopped. In granting the Youngs'/Armour's objection to the disputed photographs, the trial court excluded the pictures solely as irrelevant because they essentially showed how Adams had altered the appearance of the equipment after the company had instituted the instant case.

**{¶61}** As a general proposition, the relevancy of any proposed evidence will

18

depend upon the elements of the claim for relief. Under Ohio law, any form of property will be considered "abandoned" when "'the owner has relinquished all right, title, claim, and possession with the intention of not reclaiming it or resuming its ownership, possession or enjoyment.'" *Pancake v. Pancake*, 4th Dist. No. 11CA15, 2012-Ohio-1511, ¶10, quoting *Doughman v. Long*, 42 Ohio App.3d 17, 21 (12th Dist.1987). Therefore, "[a]bandonment requires affirmative proof of the intent to abandon coupled with acts or omissions implementing the intent. Mere non-use is not sufficient to establish the fact of abandonment, absent other evidence tending to prove the intent to abandon." *Davis v. Suggs*, 10 Ohio App.3d 50, 52 (12th Dist.1983). Stated differently, "[i]ntent to abandon 'must be shown by unequivocal and decisive acts indicative of abandonment.'" *Covey v. Natural Foods, Inc.*, 6th Dist. No. L-03-1111, 2004-Ohio-1336, ¶40, quoting *Erie Metroparks Bd. of Commrs v. Key Trust Co. of Ohio*, 145 Ohio App.3d 782, 790 (6th Dist.2001).

**{¶62}** The foregoing standard for abandonment has expressly been applied to the equipment associated with an oil and gas well. *See, e.g., Moore v. Adams*, 5th Dist. No. 2007AP090066, 2008-Ohio-5953. Therefore, abandonment of an oil and gas company's equipment can be found only when it is established that the company had the intent to relinquish total control. *Id*. at ¶53.

**{¶63}** In defending against the "abandonment" counterclaim in our case, Adams presented evidence which was meant to demonstrate that he never formed the intent to relinquish ownership or possession of the well equipment. Specifically, both he and his wife testified that, during the entire period from 1999 through 2008, he went unto the Youngs' property at least once every two months for the express purpose of maintaining

19

the well equipment. According to Adams, he would check the equipment to ensure it was still operational. Moreover, Adams also testified that, during one of his visits to the property in 2007, he posted a new sign indicating that the well equipment belonged to his company.

**{¶64}** The four disputed photographs depicting Adams' recent work on the well equipment were clearly meant to show the same point as the cited testimony. That is, the photographs could be construed to indicate that, even though Armour and the Youngs had tried in late 2008 to stop Adams from going upon the "well" property, he was still attempting to take needed steps to maintain his company's equipment on the site. From such evidence, a reasonable juror could infer that a person would not continue to maintain the equipment unless it was his intent to retain ownership and possession of it.

**{¶65}** The guiding principle of evidence law is that all relevant evidence is admissible unless a specific exception applies. *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, ¶11, quoting Evid.R. 402. Although the exclusion of relevant evidence when an exception applies is often subject to an abuse of discretion standard, absent an applicable exclusion, relevant evidence must be submitted to the trier of fact for consideration. Evid.R. 402. Evidence is deemed relevant if it has "any tendency to make the existence of any fact that is of consequences to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401.

**{¶66}** Since Adams' four proffered photographs had a tendency to show that he and his company did not abandon the well equipment, they were relevant to the material

20

issues under the third counterclaim.

{¶67} Although the trial court allowed Adams and his company to argue to the jury that the Youngs and Armour had denied them access to the property after 2008, the exclusion of the four photographs was still prejudicial. In light of the trial court's ruling on the proffered photographs, Adams was never able to present any evidence, via testimony or exhibits, of the nature of the work he performed on the equipment after the court ordered the Youngs and Armour to give him access. In the absence of any evidence concerning the nature of the repair work, the ability to raise an argument before the jury was meaningless, especially in light of the trial court's instruction to the jury that the opening and closing arguments of counsel could not be considered as evidence. Moreover, since Adams' visits on the property prior to 2009 were only to ensure that the well equipment was still operational, the proffered photographs were his sole evidence regarding the repairs he had made to the equipment.

{¶68} Even though the photographs were not taken until after the suit was filed, there is no dispute that, in the months prior to the outset of this case, the Youngs and Armour took steps to stop Adams from going onto the property and working on the equipment. Furthermore, once the action was instituted, the trial court issued a specific order giving Adams access to the property and the well equipment.

{¶69} Given these circumstances, the timing of the four disputed photographs is not determinative of their admissibility, but rather affect the weight to be afforded them. While evidence concerning Adams' actions or omissions immediately after the breach of the lease agreement would also be entitled to weight in showing his intent, the recent photographs have relevance to the disputed point. As a result, any question of weight

21

should have been left for the jury.

{¶70} Furthermore, the evidence in favor of the Youngs and Armour on their "abandonment" claim was not so overwhelming that the exclusion of the four photographs can be deemed nonprejudicial. The Youngs and Armour presented photographs showing the condition of the equipment prior to the filing of the action. In conjunction with their photographs, Mr. Young and Armour testified that, from 1999 through early 2008, they never observed Adams near the fourth well or anywhere else on the leasehold property.

{¶71} While the testimony of both Mr. Young and Armour did not directly contradict Adams' assertions as to whether he regularly visited the fourth well after 1999, their testimony did raise a serious challenge to Adams' credibility on this particular point. Under such circumstances, the admission of the four proffered photographs was critical not only to refute the opposing parties' photographs, but also to generally support Adams' contention that he consistently kept up with the maintenance of well equipment throughout the entire period in which there was no production.

{¶72} The trial court erred in excluding the four photographs offered by the company simply because they were taken after the institution of the underlying action. Moreover, since the photographs were relevant to the issue of whether it was Adams' intent to abandon the equipment, they should have been admitted. Therefore, as Adams' company is also entitled to a new trial on the "abandonment" counterclaim, its sixth assignment is well taken.

{¶73} In light of our holding that Adams' company is entitled to a new trial on the "abandonment" counterclaim, the remaining arguments under its fifth assignment are

moot.

{¶74} Pursuant to the foregoing analysis, the first and sixth assignments of error have merit. Accordingly, it is the judgment and order of this court that the judgment of the Trumbull County Court of Common Pleas is reversed, and this case is hereby remanded for the limited purpose of holding a new trial on the "abandonment" counterclaim and Interstate Petroleum Company's "excess gas" claim. As the remaining four assignments are without merit, the judgment of the trial court is affirmed in all other respects.


TIMOTHY P. CANNON, P.J., concurs,

DIANE V. GRENDELL, J., concurs in part, dissents in part, with a Dissenting Opinion.


_____


DIANE V. GRENDELL, J., concurs in part, dissents in part, with a Dissenting Opinion.

{¶75} I respectfully dissent from this court's resolution of the sixth assignment of error. In all other respects, I concur in the judgment and opinion of this court.

{¶76} With respect to the sixth assignment of error, Interstate Petroleum attempted to introduce four photographs of a well site taken in 2011 shortly before the commencement of trial. The trial court excluded the photographs on the grounds of relevance, noting that their appearance had been altered since suit was filed in 2009. Since suit was filed, Interstate Petroleum had repainted and/or primed the tanks and separator depicted in the photographs. The issue was whether Interstate Petroleum had abandoned the equipment.

23

{¶77} "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987), paragraph two of the syllabus. The phrase abuse of discretion "implies that the court's attitude is unreasonable, arbitrary or unconscionable." *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980). More particularly, an abuse of discretion has been described as a decision for which "there is no sound reasoning process that would support [it]." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

{¶78} It has been repeatedly emphasized that the abuse of discretion standard is a deferential standard. "It is not enough that the reviewing court, were it deciding the issue *de novo*, would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result." *Id.* Moreover, an appellate court may not reverse the trial court's exercise of its "broad discretion" in evidentiary matters unless a party "has been materially prejudiced thereby." *State v. Hymore*, 9 Ohio St.2d 122, 128, 224 N.E.2d 126 (1967).

{¶79} In the present case, the trial court found that the pictures depicting recent maintenance to the equipment irrelevant because the maintenance had occurred after suit had been filed and the defense of abandonment had been raised. In other words, the pictures did not depict the appearance of the equipment at any time relevant to the claims being litigated. Because its decision is supported by sound reasoning, this court is not at liberty to disturb it, regardless of whether we would have ruled otherwise.

{¶80} The majority finds the pictures relevant because they "could be construed to indicate that, even though Armour and the Youngs had tried in late 2008 to stop

24

Adams from going upon the 'well' property, he was still attempting to take needed steps to maintain his company's equipment on the site." *Supra* at ¶ 64. In fact, the photographs do not indicate that Adams was attempting to maintain company property in 2008. It is a very dubious proposition to suggest that photographs of maintenance work performed in 2011 are relevant to prove that efforts were made to maintain the equipment in 2008. Contrary to the majority's analysis, this is not a situation involving an exception to otherwise relevant evidence. Rather, the photographs are not relevant evidence in the first place.

{¶81} Assuming, arguendo, that photographs of maintenance performed in 2011 are probative of Interstate Petroleum's intentions in 2008, their probative value is fatally compromised by the fact of the intervening lawsuit/abandonment defense, as recognized by the trial court. In 2008, legal action had not been initiated and the Youngs/Armour had not raised the claim that Interstate Petroleum abandoned the property. Once the claim of abandonment was raised, any action taken by Interstate Petroleum was inevitably undertaken for the purpose of refuting the claim of abandonment. Thus, the photographs at issue are neither a reliable nor a relevant indicator of what Interstate Petroleum might have intended to do in 2008.

{¶82} Interstate Petroleum made the following argument at trial for the admission of the photographs:

{¶83} Plaintiff's counsel: Judge, part of the, part of its relevance is the fact that we couldn't get in there and perform this maintenance because we weren't allowed in. And that's gonna be his [sic] testimony.

{¶84} The Court: That can be argued.

{¶85} Plaintiff's counsel:    But it's our evidence.  That we were kept out of there. Our access road was denied.  We had asked for additional access.  We were denied access.  We didn't --

{¶86} The Court:            You can argue that point to the Jury, but the pictures of this remedied immediately before trial, there's no grounds for this to come in as evidence.

{¶87} Assuming, arguendo, that the pictures of the recently maintained property were relevant to Interstate Petroleum's intentions prior to suit being filed, the above colloquy demonstrates that Interstate Petroleum suffered no material prejudice.  The trial court allowed Interstate Petroleum to argue that it was prevented from performing maintenance.  Moreover, both Brian Armour and Maurice Young admitted that, as of 2008, they did not permit Interstate Petroleum on the property.

{¶88} The majority finds the exclusion of the photographs prejudicial because, without their admission, Interstate Petroleum was prevented from introducing "any evidence, via testimony or exhibits, of the nature of the work * * * performed on the equipment after the court ordered the Youngs and Armour to give [it] access." *Supra* at ¶ 67.  The majority's position fails to grasp that the nature of the work performed in 2011, on the eve of trial, is not relevant to the state of the property in 2008.  The majority's position with respect to prejudice is also inconsistent with its position that the probative value of the photographs is that they allow for the inference that Interstate Petroleum intended to retain ownership of the property as evidenced by the maintenance work performed after the trial court ordered the Youngs/Armour to allow access.  As demonstrated above, the trial court did not prevent Interstate Petroleum

26

from arguing that the Youngs/Armour prevented it from maintaining the equipment in 2008. So there was no prejudice in this respect. Beyond the relevance of testimony regarding Interstate Petroleum's intentions in 2008, the majority does not explain why the "nature of the work" performed in 2011, presuming it was indicative of what Interstate Petroleum intended in 2008, is relevant to the merits of this case.

**{¶89}** In sum, the trial court's decision to exclude the photographs at issue is supported by sound reasoning and resulted in no material prejudice to Interstate Petroleum's case. The majority's decision to reverse is irreconcilable with the deference due the lower court's decision. *Estate of Johnson v. Randall Smith, Inc.*, __ Ohio St.3d __, 2013-Ohio-1507, __ N.E.2d __, ¶ 23 (in reversing the trial court's decision to exclude evidence, "the court of appeals * * * did not analyze under an abuse-of-discretion standard whether the trial court had acted unreasonably, arbitrarily, or unconscionably in reaching its conclusion").

**{¶90}** Accordingly, I respectfully dissent on this issue. In all other respects, I concur in the judgment and opinion of this court.